23 N.Y.2d 213 (1968)
In the Matter of Central School District No. 2 of Towns of Coeymans, New Scotland, Bethlehem and New Baltimore et al., Appellants,
v.
New York State Teachers' Retirement System et al., Respondents.
Court of Appeals of the State of New York.
Argued May 14, 1968.
Decided November 21, 1968.
John P. Walsh, James B. Donovan and Raymond J. Messina for appellants.
Bruce Bromley, Alan J. Hruska and Donald Strauber for respondents.
Judges SCILEPPI, BERGAN and KEATING concur with Chief Judge FULD; Judge BREITEL dissents and votes to modify in a separate opinion in which Judges BURKE and JASEN concur.
*217 Chief Judge FULD.
This appeal poses important and far-reaching questions as to the administration of the New York State Teachers' Retirement System. More particularly, it concerns the power of the System's Retirement Board to take certain factors into account in computing and fixing the rates of employers' contributions.
The petitioners are local school districts which initiated this proceeding, pursuant to article 78 of the CPLR, on behalf of the more than 800 such districts which participate in the system. Their petition, containing five separate counts, challenges as excessive the rates of contribution imposed on them as *218 employers for the fiscal years 1959 through 1965.[1] The respondents attacked the sufficiency of the petition and, in addition, charged that the proceeding was barred by the Statute of Limitations and by laches. The court at Special Term agreed with the defendants on both scores; the Appellate Division, not passing on the merits of the controversy, affirmed the dismissal of the petition on the ground that the proceeding was not timely brought. Since the court has concluded that the board acted within permissible statutory limits in arriving at each of the challenged determinations, we find it unnecessary to consider the respondents' further contention as to whether the proceeding was time-barred.
At the outset, it will be not only helpful to understand the structure of the Retirement System as established by the Education Law (art. 11) but important to bear in mind that it is the Retirement Board's primary responsibility to insure that all of the liabilities of the system to its teacher beneficiaries can be met when they accrue.[2]
The Teachers' Retirement System is actually a congeries of separate funds, under the administration of the Retirement Board (Education Law, § 504, subd. 1; § 508), which are used to provide various benefits for public school teachers throughout the State. Some of these benefits  called annuities  are financed out of the teachers' own contributions to an "Annuity Savings Fund" (§ 516), while the remainder  termed pension benefits  are paid for by the local school districts through *219 their contributions to a "Pension Accumulation Fund."[3] In the present case, we are concerned only with the employers' contributions and the methods used by the board to compute their amounts.
In accordance with the statutory scheme, the employers' payments to the Pension Accumulation Fund were made up of three components, namely, a "normal contribution" (§ 517, subd. 2, par. b), a "deficiency contribution" (§ 517, subd. 2, par. c) and a "special deficiency contribution" (§ 517, subd. 2, par. c). Each of these was computed at a different rate and designed to achieve a different purpose but, taken together, they were meant to be sufficient to enable the fund to meet all of the obligations imposed upon it  the "total pension liability." If the amounts collected were insufficient for this purpose, and the fund did not build up sufficient reserves, then, the board would be required to assess the employers directly in the year that the unanticipated and unaccounted for liabilities had to be paid (§ 517, subd. 2, par. d). On the other hand, if the board were to collect more than it needed, then, the excess would eventually be returned to the employing school districts in the form of reduced contribution rates in later years. It should, therefore, be made clear that, in the long run, the overall contributions of the employers will always equal the amount necessary to finance the fund's liabilities regardless of the outcome of this case.
Each of the five causes of action set out in the petition challenges the board's assessment of one of the three types of contributions. Before discussing these claims, we deem it desirable to consider the nature of the contributions, how they are computed and the purposes they serve.
The Normal Contribution
The normal contribution is the principal source of revenue for the Pension Accumulation Fund. Its rate of assessment is determined on a "level percentage" basis  that is, the rate is expressed in terms of a percentage of the teachers' salaries which will, theoretically, remain unchanged from year *220 to year.[4] In actual practice, however, the rate is not level at all but is constantly adjusted to account for changes in the fund's liabilities and the inevitable inaccuracies in actuarial estimates of their costs. Although the statute requires that such adjustments be made every five years (§ 508, subd. 5), the board has actually made it a practice to reassess the rate annually.
Section 517 (subd. 2, par. b) provides for two different methods of determining the liabilities which are to be financed through the normal contribution: a "first method," used concurrently with the deficiency contribution, and a "second method," to come into effect after the deficiency contribution has ceased.[5] The first method only provides for a limited portion *221 of the fund's liabilities  the death benefits and retirement pension payments for "new entrants" (teachers who joined the system after it was established in 1921). The amount collected was, therefore, insufficient to provide (1) for these benefits for teachers who were employed at the inception of the system, denominated "present teachers", and (2) for other liabilities of the fund, some of which are discussed below, on account of all teachers over and above their death and retirement benefits. These additional liabilities were to be financed through the deficiency contribution.
The second method, which is to be employed after the termination of the deficiency contribution, was originally intended to be used at a time when the normal contribution would be the sole source of revenue for the Pension Accumulation Fund. The statute provides that the rate is to be computed at a level sufficient to meet the "total liabilities of the pension fund" (§ 517, subd. 2, par. b). The second method was utilized for the first time in the fiscal year 1965.
The Deficiency Contribution
Because of the limited nature of the normal contribution as computed under the first method, there existed, from the beginning, an "amount of the total pension liability on account of all contributors and beneficiaries [which was] not dischargeable by the * * * normal contribution" (§ 517, subd. 2, par. c). This amount, called the "deficiency balance", was to be provided for through the deficiency contribution. The rate at which this contribution was to be assessed was computed in a manner completely unlike that used for the normal contribution. Instead of striving for a relatively constant percentage of the teachers' salaries, the deficiency contribution rate was designed to provide, at least, a certain dollar amount of revenue each year until the entire deficiency balance was eliminated.[6]
*222 The termination of the deficiency contribution was governed by section 517 (subd. 2, par. e); that provision reads in this way:
"The deficiency contribution shall be discontinued as soon as the accumulated reserve in the pension accumulation fund shall equal the present value, as actuarially computed and approved by the retirement board, of the total liability of such fund less the present value, computed on the basis of the normal contribution rate then in force, of the normal contributions to be received on account of teachers who are at that time contributors."
In other words, the deficiency contribution was to cease and terminate when the normal contribution and the assets of the fund were sufficient to finance its "total liabilities" and the deficiency balance was thereby liquidated.
The Special Deficiency Contribution
When the system was first established in 1921, it was contemplated that all of the liabilities of the fund would be covered either by the normal or the deficiency contribution. In 1956, however, the Legislature enacted an amendment to the statute which substantially increased the pension benefits to be accorded to the teachers (L. 1956, ch. 730). Financing these additional benefits through the methods then provided would have resulted in either a sharp increase in the normal contribution rate or a major extension of the deficiency contribution which, by then, had grown quite high due to the requirements of section 517 (subd. 2, par. d). In order to alleviate this burden, the Legislature created a special deficiency contribution, designed to provide a lower rate by amortizing the additional liability over an extended period of time.
Another large increase in the fund's liabilities arose from the decision of this court in Birnbaum v. New York State Teachers Retirement System (5 N Y 2d 1). In that case, we held that a teacher's annuity benefits must be determined on the basis of mortality tables in effect when he joined the system, *223 and could not be subsequently decreased.[7] Since the teachers' own contributions were insufficient to provide these benefits, the burden of this additional liability fell upon the Pension Accumulation Fund. Once again, the Legislature acted to lessen the burden upon the employers by providing that the amount of this new liability could be added to the special deficiency and amortized at the extended rate (L. 1959, ch. 141, § 2).
The most notable feature of the special deficiency contribution, aside from its low rate, was its limited flexibility and scope. It was used solely to finance the two liabilities just discussed  the added benefits enacted in 1956 and the Birnbaum liability  and, after the initial estimates of the cost of these liabilities, there was no provision for altering the rate in order to account for any inaccuracies in the estimates. The rate was initially fixed at a level which would have amortized the estimated cost of the liabilities over a 30-year period and, once determined, that rate continued to be assessed against the employers without change.
The Petition
As already noted, each of the five causes of action in the petition challenges as excessive the board's assessment of one or another of the three types of contributions. The first and second counts charge that the board's continuation of deficiency contributions for the fiscal years 1963 and 1964 was contrary to section 517 (subd. 2, par. e). The third and fourth counts allege that the special deficiency contribution rate set by the board in 1958 exceeded the rate authorized by section 517 (subd. 2, par. c). And the fifth cause of action asserts that the normal contribution rate fixed by the board for 1965 was excessive in that it included components not authorized by section 517 (subd. 2, par. b). Study of each of these claims demonstrates that the challenged determinations were all within the scope of the *224 board's authority and consistent with the statutory scheme and that, accordingly, no one of the counts states a valid or sufficient cause of action.[8]
The First Cause of Action
As discussed above (supra, p. 221), section 517 (subd. 2, par. e) provides that the deficiency contribution was to terminate when the deficiency balance  the value of the liabilities not dischargeable by the normal contribution and the assets on hand in the fund  was eliminated. Based upon the items which had traditionally made up the deficiency balance in previous years, this situation (the termination of the deficiency balance) came about some time during the fiscal year 1963. The petitioners claim that the board, by assessing the full deficiency, had collected a substantial excess which ought to be returned. More specifically, the first cause of action alleges that the deficiency balance at the beginning of 1963 was about $20,000,000 but that the board had collected over $32,000,000 in that year through the deficiency contribution.
Even if we were to accept the petitioners' hypothesis that an excess was collected in the fiscal year 1963, it is clear that they would not be entitled to its return. As noted in the previous discussion of the deficiency contribution (supra, p. 221, n. 6), the amount to be collected from the employers through the deficiency contribution was in no way dependent upon the amount of the deficiency balance. As long as the deficiency contribution was still in effect, the board was required to assess, in each year, a minimum of 3% more than it collected the preceding year (§ 517, subd. 2, par. d). Thus, not only was it within the board's power to collect the amount it did in 1963 but, in point of fact, it would have been impermissible for it to have collected less.
Because of the minimum rate requirement, it was virtually inevitable that, in the final year, the deficiency contribution would exceed the amount of the deficiency balance and an excess would be collected. The statute imposes no requirement that the amount of this excess be directly returned to the contributing *225 school districts, as the petitioners urge, but, presumably, contemplates that it would be added to the fund's assets, thereby reducing the amount of the normal contribution. Consequently, even assuming that the deficiency balance had been eliminated during the year 1963 and an excess collected, the petitioners have not established any right to the return of this excess. The first cause of action was, therefore, properly dismissed.
The Second Cause of Action
As stated (supra, p. 224), the deficiency balance, as it had previously been computed, would have been eliminated during the fiscal year 1963. By that year, however, the board had decided that this customary method of computing the deficiency balance failed to take into account a substantial liability of the Pension Accumulation Fund which was not being discharged by the normal contribution  the liability for future interest deficits. If this liability were to be recognized, there would be a substantial increase in the deficiency balance which, the board concluded, justified extending the collection of the deficiency contribution through the fiscal year 1964. The petitioners maintain that the liability for future interest deficits could not properly be considered in the valuation of the deficiency balance and, in the second cause of action, question the validity of the continuation of the deficiency contribution for 1964 and demand the return of the entire amount of such deficiency contribution assessed in that year.
Before this question may be resolved, it is necessary to understand the cause and nature of the interest deficit liability of the Pension Accumulation Fund. Since 1921, when the system was first established, the board has been required to annually credit the accounts of the teachers in each of the system's funds at a "regular interest" rate  defined as 4% for teachers who joined the system prior to July 1, 1948 and 3% for those who joined after that date (§ 501, subd. 9)  even though the actual earnings on the system's investments were insufficient to provide such interest. Realizing that there would be years in which the system would not be able to pay regular interest out of its investment earnings and that additional payments would have to be made to meet this liability, the statute provided, from the very inception of the system, that the difference between *226 the amount earned and the amount which had to be credited to the teachers' accounts  namely, the "interest deficit"  would be paid for by the employers through the Pension Accumulation Fund (§ 508, subd. 2).[9]
Although the fund's obligation to pay for interest deficits was clearly a part of its total liability which was not dischargeable out of the normal contribution, no attempt was made to estimate the cost of this liability in advance, and interest deficit payments were added to the deficiency balance only in the year in which they had to be paid. However, in 1958, after interest deficits had occurred regularly for more than 10 years, the State Insurance Department recommended that the board begin planning for the financing of future interest deficits by adding their estimated cost to the deficiency balance before they accrued. By 1964, when the deficiency balance as it had previously been computed had been fully liquidated, the board was faced with the choice of either adopting the Insurance Department's recommendation or ceasing to assess any deficiency contribution. The former path was chosen for that year and, accordingly, the deficiency contribution was continued.
The contention that the board was required to ignore the anticipated liability of the fund for interest deficits in computing the deficiency balance is not borne out by the statute; there is simply nothing in the legislation to support such a contention. Although it was true that the primary item which made up the deficiency balance prior to 1964 was the fund's liability on account of "present teachers"  those who had been employed before the system was established in 1921  there is no substance to the argument that the deficiency contribution was to be confined to meeting this "initial" or "historic" purpose. Indeed, the language of the statute points the opposite conclusion. It requires the board to determine the deficiency balance on the basis of the "total pension liability on account of all contributors and beneficiaries not dischargeable by the * * * normal contribution" (§ 517, subd. 2, par. c) and states that the contribution is to continue until "the present value, as actuarially computed and approved by the retirement board, of *227 [such] total liability" is equalled by the fund's assets and future normal contributions (§ 517, subd. 2, par. e). The use of the words, "all contributors and beneficiaries", negates the notion that the deficiency contribution was designed solely to furnish funds for "present teachers," and the language of section 517 (subd. 2, par. e) unmistakably gives the board the authority to "approve" the computation of liabilities and to adjust the amount of the deficiency balance accordingly.
We can only conclude that the words, "total liability," as they appear in the statute mean just what they say  "total liability"  and that the board was acting within the scope of its power when it decided to include the statutory liability for interest deficits in its computation of the deficiency balance. Since, as of 1964, the liability for interest deficits was not accounted for in the normal contribution and since it was, without question, a liability of the Pension Accumulation Fund, the board was thoroughly justified in adding that liability to its deficiency balance for the fiscal year 1964 and, on that basis, extending the deficiency contribution into that year.
The Third and Fourth Causes of Action
By their third and fourth causes of action, the petitioners challenge the special deficiency contribution rates which were assessed in each year since 1959 and seek an order directing the board to assess the rate differently in the future. It is urged that the board has failed to comply with the portion of section 517 (subd. 2, par. c), set forth below, which prescribes the method of fixing the rate:
"The actuary shall determine the annual payment which if made in each fiscal year commencing with the year beginning the first day of July, nineteen hundred fifty-eight, for a period of thirty years will provide for [the] special deficiency and the per centum of the total compensation of all contributors during the preceding school year which is equivalent to such annual payment shall be known as the special deficiency contribution rate."
When the provision was first enacted, the board used this formula to derive the percentage of teachers' salaries which, as conditions then stood, would have yielded an annual amount *228 necessary to amortize the special deficiency over a 30-year period. This percentage was raised two years later to compensate for the added Birnbaum liability but, aside from that, the rate has since remained unchanged. Teachers' salaries, meanwhile, have been constantly rising, and the application of this fixed percentage to a rising payroll has yielded ever growing dollar amounts. By the time this action was brought, the revenue derived from the special deficiency contribution had grown sufficiently to liquidate the entire special deficiency balance in 17 years. The petitioners argue that the rate should have been reduced as salaries increased so as to yield a constant dollar amount.
A fair reading of the statute, however, fails to support the petitioners' contention. Although the actuary was initially required to determine the rate on the basis of an "annual payment"  a dollar amount which would have resulted in a 30-year amortization period  it does not define the contribution rate in terms of such payments but as the percentage of teachers' salaries "during the preceding school year"  that is, during the fiscal year 1958  which would have yielded that amount. Thus, it was the percentage of salaries which constituted the fixed special deficiency contribution rate and the "annual payment" figure was only a factor to be used in the initial computation of that rate.
In support of their interpretation of the statute, the petitioners rely upon what they consider to be an expression of legislative intent that the special deficiency was to be amortized over 30 years. It is readily apparent, however, that the Legislature was not really concerned with the time period over which the deficiency was to be liquidated. It merely provided a long time factor in order to insure that the rate assessed would not be unduly high so as to avoid imposing an undue burden upon the school districts. If, in later years, the special deficiency could be amortized in a shorter period of time without necessitating an increase of the original low rate, this would be all to the good and hardly inconsistent with the legislative purpose.
The Fifth Cause of Action
The fifth count relates to the board's assessment of the normal contribution rate in the fiscal year 1965. The level of the normal *229 contribution rate is directly dependent on the value of the liabilities which must be financed through it, and the petitioners attack the board's inclusion, in its estimate of these liabilities, of (1) a reserve against interest deficits (based on the assumption that the system's earnings would average 3½% per year); (2) a reserve against future actuarial losses (an amount computed on the basis of a one-year setback in mortality tables); and (3) the "Death-Gamble" liability (based upon an assumption that it would be extended beyond July 1, 1965).
The challenged items were incorporated into the normal contribution formula at the board's meeting of March 19, 1964, when it was decided to cease collecting the deficiency contribution and to switch to the "second method" of determining the normal contribution rate, that is, the method based upon the "total liabilities of the pension fund" (supra, pp. 220-221). It is our conclusion that the term, "total liabilities," is broad enough to encompass each of the items contested by the petitioners.
(1) Reserve against future interest deficits
As already indicated (supra, p. 226), the board originally decided, in 1964, to accept the Insurance Department's recommendations and to finance its prospective interest deficit liabilities through an extension of the deficiency contribution. The following year, however, it was determined that, in view of the high level of the deficiency contribution rate, this procedure placed an unnecessary burden upon the school districts and that it would be equally sound, and less expensive, for the board to finance this liability out of the normal contribution.[10]
In order to place a definite value on the fund's liability for future interest deficits, the board, on the basis of past experience, estimated that the system's future earnings would average 3½%. As a result, the annual cost of the interest deficit liability would approximate ½% of the amount in the accounts of the *230 pre-1948 teachers. The petitioners contend that it was improper for the board to assume that such an interest deficit liability would occur and to include it in the valuation of the total liabilities used to determine the normal contribution rate  pointing, in support of that argument, to the statutory requirement that the normal contribution rate be computed "on the basis of regular interest" (§ 517, subd. 2, par. b). In making this contention, the petitioners have confused the determination of the contribution rate, necessary to finance the various liabilities, with the board's estimate of the amount of the liabilities themselves. Section 517 (subd. 2, par. b) merely provides a method, after the fund's liabilities are determined, of financing them on a level percentage basis. It does not limit the board in its determination as to which liabilities are, or are not, to be financed through this method, or how much those liabilities will be.
Of course, the "regular interest" rate is a factor which must be taken into account by the board in determining the amount that the fund will have to pay for interest deficits in any given year and, in that sense, it could be said that the reserve against future interest deficits was computed "on the basis of regular interest". However, what is more significant, the board  after estimating that the interest deficit liability would be approximately ½% per annum to the accounts of the pre-1948 teachers  determined the present value of such interest deficits (i.e., the interest deficit liability) and otherwise applied the usual normal contribution formula, including its "regular interest" earnings assumption, to determine the level percentage rate necessary to finance this liability (see supra, p. 220, n. 4). Thus, the procedure followed was fully consistent with the provisions of section 517 (subd. 2, par. b), and there is no warrant for the claim that the board violated any of the provisions of the statute.
(2) Reserve against future actuarial losses
Actuarial tables are, by their very nature, only estimates and, to the extent that such tables underestimate the longevity of the system's teachers, the amount needed to finance their pension benefits will also be understated. The losses to the fund resulting from underestimation of longevity  which proved to be a consistent characteristic of the board's actuarial tables  were called "experience" or "actuarial" losses. In determining *231 the normal contribution rate for the fiscal year 1965, the board included, in its estimate of total liabilities, an amount designed to anticipate and provide for such losses, called the "reserve against future actuarial losses".[11] The petitioners do not argue that the board cannot try to minimize actuarial losses but they take the position that the method followed was improper. The only method available to the board, they insist, is for it "formally" to adopt new tables whenever a discrepancy develops between its estimates and actual experience.
Certainly, the board has full power to adopt such new tables but there is nothing in the statute which prescribes that this should be the sole method of dealing with the problem of actuarial losses. On the contrary, if the board may adopt new tables, there is no reason to assume that it may not take steps to improve the result which it obtains from its old tables. From the standpoint of the school districts, their rate increase would be the same whether it was caused by the establishment of a reserve for actuarial losses or newly adopted tables reflecting increased life expectancy; the districts were not adversely affected by the method chosen. In fact, the use of the reserve method avoided the substantial expense involved in altering and adjusting all of the various actuarial tables individually in each year and (by reason thereof) very likely resulted in lower employer contributions to the expense fund.
(3) The "Death-Gamble" liability
In 1963, the Legislature enacted a new benefit, the "Death-Gamble" benefit, payable out of the Pension Accumulation Fund (§ 512, subd. 3). This provision was initially enacted in 1963 for a single year, although it has been extended every year since then. In computing the normal contribution rate for the fiscal year 1965, the board made the assumption that such extensions would continue to take place indefinitely and computed the amount of the liability as though it were a permanent addition to the fund's obligations. The petitioners contend that this assumption was unwarranted and that the board should have *232 assumed that the "Death-Gamble" benefit would cease to apply after June 30, 1965. The argument lacks force. The board's recognition of the true nature of this liability as a permanent addition to the fund's obligations was completely justified, if not required.
Following the enactment of the constitutional provision prohibiting reductions in pension benefits (N. Y. Const., art. V, § 7), it has been customary for the Legislature to enact all new benefits on a year-to-year basis. The purpose of this is to permit the Legislature to subsequently change a provision which turns out to be unworkable. If the legislation were not on a year-to-year basis, it would be constitutionally impermissible to later make a change because of the vested rights acquired by the system's members. This does not mean, however, that the benefits are intended to be temporary. As a matter of fact, no benefit so enacted has later been discontinued. It would be foolhardy to assume that a benefit such as the "Death-Gamble" will be discontinued after a year and to make no provision for the financing of future benefits. Actually, continuation of the "Death-Gamble" benefit is almost as certain as death itself, and the board, conscious of its responsibilities, might well have been derelict in its duty had it not recognized this and taken it into account in determining the normal contribution rate.
Conclusion
Each of the causes of action contained in the petition, in effect, charges the board with acting too conservatively in making its determinations as to the amounts necessary and desirable to maintain the system in a sound financial condition. By its conservatism, the board has assured the thousands of its beneficiaries that it will always have sufficient funds to pay them the benefits to which they are entitled while, at the same time, protecting the contributing school districts against the danger of unreasonably high contributions needed to meet unanticipated liabilities in future years.
Regardless of how we read the provisions relating to the rates of contribution, it is clear that the Education Law does not require the board to disregard the fact that the system's assets were not earning regular interest or ignore any other factor *233 which might affect the future obligations of the fund. It may well be that the contributions challenged here will turn out to be larger than they need have been to meet all of the fund's liabilities. This, though, is something which, in the very nature of things, cannot be ascertained at this time. If anything is clear from a reading of this case, it is that the fixing of rates and the making of actuarial predictions is a highly complex process involving many variables and requiring considerable expertise. The immediate benefit which might accrue to the petitioners from the imposition of rigid rules governing the board's determinations is far outweighed by the potential harm to the Retirement System and its members that would result from restricting the board's power to make realistic determinations based upon all of the information available to it.
The order appealed from should be affirmed, without costs.
BREITEL, J. (dissenting in part).
A number of school districts contend on this appeal that the New York State Teachers' Retirement System has illegally assessed them for contributions to the system in violation of explicit, mandatory provisions of the governing statutes and in the exercise of a purported discretion which the Retirement Board does not have. The petition and amended petition seek redetermination of the rates of contribution imposed on the school districts as employers under the system and the refund of allegedly excessive payments.
Special Term, on the pleadings and supporting papers, held that the four-month Statute of Limitations (CPLR 217) applicable to the review of discretionary determinations in article 78 proceedings barred the several claims. In the alternative, Special Term held that if the claims were in the nature of mandamus they were barred by laches. Reaching the merits, it held that the board had the discretion to impose the questioned rates of contribution and that the exercise of discretion was not unreasonable (46 Misc 2d 225). The Appellate Division, in affirming, did not determine the merits; although noting that there was apparent substance to some of the contentions of the school districts, it held that the several claims were barred by the Statute of Limitations or laches (27 A D 2d 265).
A simplifying factor in the analysis of this case is that the limitations or laches issues are rolled up into the substantive *234 issue and are largely controlled by its resolution. The ultimate substantive issue is whether the board, under the governing statutes, has discretion in determining the employers' rates of contribution or whether the statutes are explicit and mandatory, leaving no discretion to the board in using specified interest and actuarial factors in determining the liabilities of the system and, therefore, the requisite rates of contribution.
If the board has the discretion claimed for it by respondents, then the four-month Statute of Limitations applies from the time the board made its several determinations, and the claims are barred. On the other hand, if the statute explicitly mandates the precise factors to be used in computing the liabilities and rates of contributions, then the duty imposed by the statute continues and the limitation period does not begin until demand has been made upon the board and it has refused to perform its statutory duties. Of course, the proceeding may still be barred by the equitable doctrine of laches. Hence, analysis inevitably searches out the initial issue of whether the board had the purported discretion it exercised (and if the exercise was also a reasonable one). Thus, the procedural and substantive issues may be largely determined by the same analysis.
The board is charged with the administration of the retirement system, which furnishes, among other things, retirement allowances and death benefits for public school teachers upon their retirement from the school system or death (Education Law, §§ 502, 504, 510). The retirement allowances consist of employee-contributed annuities and employer-contributed pensions (§ 510). This case involves only the rates of contribution by employers to fund the pensions and part of the death benefits. These payments are largely financed from a pension accumulation fund, which is funded through yearly assessments made upon school districts at a rate based upon the total compensation paid to teacher members of the retirement system (§ 517, subd. 2). The assessments consist of three contributions: the "normal contribution", the "deficiency contribution" and the "special deficiency contribution".
The "normal contribution" rate is applied to the total compensation earned by those teachers employed after August 1, 1921 who became members of the retirement system after May 1, 1924 ("new entrant"), and is designed to accumulate sufficient *235 funds to cover pensions and death benefits for new entrants upon their retirement or death (§ 517, subd. 2, par. b).[1] The "deficiency contribution" rate is applied to the total compensation of all member teachers and is designed to accumulate sufficient funds to cover pensions and death benefits not covered by the normal contribution (§ 517, subd. 2, par. c).[2] Historically, the deficiency represented the pension liability for teachers who had been employed before the pension accumulation fund had been established ("present teachers") and thus before contributions to fund their pensions and death benefits, to the extent they reflect prior service, could have been assessed. The school districts contend that the scope of the deficiency contribution is confined to its historical purpose, while the board argues that it is not so limited.
Section 517 provides that the deficiency contribution "shall be discontinued" when the moneys in the pension accumulation fund, together with the moneys which would be accumulated in the future through the normal contribution, would be sufficient to cover future aggregate pension liabilities as actuarially computed and approved by the board (§ 517, subd. 2, par. e). After the deficiency contribution has been discontinued, the normal contribution rate is computed on the basis of the compensation of all member teachers under a slightly different formula (§ 517, subd. 2, par. b).[3]
The "special deficiency contribution," by express statutory authorization, has been assessed since the school year 1958-1959 *236 in order to fund a then newly created substantial increase in pension benefits. The rate of this assessment is computed as follows: "the annual payment which if made in each fiscal year commencing with the year beginning the first day of July, nineteen hundred fifty-eight, for a period of thirty years will provide for such special deficiency and the per centum of the total compensation of all contributors during the preceding school year which is equivalent to such annual payment shall be known as the special deficiency contribution rate." (§ 517, subd. 2, par. c; L. 1956, ch. 730.) An unexpected annuity liability, resulting from the decision of this court in Birnbaum v. New York State Teachers Retirement System (5 N Y 2d 1, mandating the use of mortality tables extant when members entered the system), is also funded by express statutory direction through this special deficiency contribution (§ 517, subd. 2, pars. c, g; L. 1959, ch. 141).[4]
Computation of the normal, deficiency, and special deficiency contribution rates is based upon a valuation of assets and liabilities, that is, by taking and balancing the total amount of present and future liabilities on the pension side of the system, and the prospective accumulation to meet those liabilities from present assets and returns from future contributions by employers. These valuations require the use of a number of actuarial assumptions, such as the length of eligible service of member teachers, the length of time over which pension payments will be made, and the interest which will be earned by the moneys in the pension accumulation fund (§ 508, subds. 2, 5). Valuations necessary for determining the normal contribution rate are to be made, the statute provides, "On the basis of regular interest and of such mortality and other tables as shall be adopted by the retirement board" (§ 517, subd. 2, par. b). "Regular interest" is statutorily defined as 4% as to teachers *237 who became members of the system on or before June 30, 1948, and 3% as to teachers who became members on or after July 1, 1948 (§ 501, subd. 9). Similar provisions are contained in the statute with respect to other fund valuations (e.g., § 501, subds. 10, 15, 16).
It is now appropriate to turn to a resolution of the issues as they are presented in the five causes of action. The first two relate to the allegedly illegal imposition by the board of deficiency contributions after the initial or historic deficiency resulting from the provision of benefits for teachers with prior service (present teachers) had been fully discharged under the statutory scheme for funding that deficiency. The board concededly used the deficiency contribution for 1963-1964 to fund a deficiency created by the failure of the accumulated funds to earn regular interest. It is concluded that the board's imposition of a deficiency contribution beyond the period necessary to provide funds for the pension payments to present teachers was unlawful for two reasons. First, the deficiency contribution could not be continued for purposes other than the historic purpose. Second, even if the deficiency contribution could be used for other purposes, it could not be used to fund an interest deficit resulting from the board's use of a "more realistic" interest assumption rather than that authorized by statute in making the directed necessary valuations.
In their third and fourth causes of action, the school districts contend that the special deficiency contribution rate has been improperly fixed, resulting in liquidation of the special deficiency within a shorter period than the 30 years mentioned in the statute. It is concluded that in setting a constant rate for assessment of the special deficiency contribution on an initial assumption of a 30-year period for liquidation, the board properly followed the statutory formula, which does not also require that the liquidation of the deficiency, as it actually works out, be extended over any specific period of time.
In the fifth and final cause of action, the school districts challenge the normal contribution rate fixed for 1964-1965. In fixing this rate the board considered three disputed factors: (1) "possible use of a 3½ percent interest rate", rather than uniform application of the "regular interest" rate; (2) an adjustment in the mortality tables to allow for changes in mortality rates; *238 and (3) anticipated liabilities for "death-gamble" benefits not yet enacted. It is concluded that the consideration of each of these factors was unauthorized under the statutory formula for determining the normal contribution rate.
The first and second causes of action involve the assessment of the deficiency contribution for 1962-1963 and 1963-1964. The 1962-1963 deficiency contribution resulted in the collection of $31,636,494, more than enough to liquidate the historic deficiency balance of $20,443,787. The school districts contend that the 1962-1963 assessment was illegal and seek recovery of the overcollection (first cause of action). Moreover, the board assessed a deficiency contribution for the year 1963-1964, after the historic deficiency had concededly been liquidated. Petitioners contend that no deficiency contribution could be assessed for 1963-1964 and seek recovery of the entire assessment (second cause of action).
The board contends that it was proper to continue the deficiency contribution in order to obtain funds to cover an "interest deficit", resulting from the failure of the fund to earn "regular interest", and other liabilities. Thus, in 1963, when the historic deficiency was concededly liquidated, the board provided for a new deficiency, taking into account the interest deficit, the liabilities imposed by the Birnbaum case, and the expectation that certain temporary but renewable death-gamble statutes would be continued. The rate for the newly calculated deficiencies was to be applied for the fiscal year 1963-1964.[5] The board maintains that the statute does not require that the deficiency contribution be terminated once the initial or historic deficiency has been liquidated. They further assert that their purposes in continuing the deficiency contribution were fiscally sound and within their discretionary powers under the statute.
Under the statute the initial or historic deficiency is that amount of prospective pension liability "on account of all contributors and beneficiaries" not dischargeable by the actuarial value of future normal contributions (§ 517, subd. 2, par. c). The normal contribution rate, assessed on the basis of prospective *239 pension liability to new entrants, is designed to accumulate sufficient funds to cover pension payments to new entrants. Thus the prospective liability or deficiency which would not be discharged by the normal contribution rate can only be that liability to present teachers, for whom there had been no funding during their earlier service. (As already noted, there were separate statutory authorizations made from time to time to fund newly created or unanticipated liabilities, namely, increased benefits and the Birnbaum case liabilities.)
It is conceded by the board that this historic deficiency had been liquidated during the year 1962-1963. Under the statute, it was then necessary to discontinue the deficiency contribution. Thus, the statute states that "[t]he deficiency contribution shall be discontinued" as soon as the present value of prospective pension liability is covered by the value of present assets and the actuarial value of future normal contributions (§ 517, subd. 2, par. e). Since that condition was fulfilled by 1963-1964, the board no longer had power to assess further deficiency contributions.
Even assuming that the deficiency contribution could be used for purposes of funding liabilities other than those owed to present teachers, the three ostensible purposes of the board were invalid.
First, the board may not, as it attempted to do, fund a liability resulting from the use of interest assumptions other than the regular interest prescribed by the statute. In determining the liability to be funded by the normal contribution rate ("pension reserve" for new entrants) the statute requires the use of an assumption of regular interest. It would not make much sense to require a regular interest assumption in determining the contributions necessary to discharge one portion of total pension liability and then to permit the use of different interest assumptions in determining how to liquidate the deficiency or remainder of the total liability. After all, the deficiency is simply the difference between total liability and the pension liability to new entrants. To use different interest assumptions in computing different parts of the formula would be inconsistent.
It is concluded, therefore, that the statute requires the use of regular interest in computing the deficiency contribution as well as the normal contribution. Indeed, the above analysis is *240 actually supported by the actions of the board in previous years. Thus, it was not until 1963-1964 that the relevant valuations were made by the board on the basis of anything other than regular interest, even though in 1958 it was clear, at least to the board, that the regular interest figure was "unrealistic", in the sense that it did not conform to the actual earnings for a considerable period.
It may be true, as the board contends, that the uniform use of regular interest will result in an interest deficit, since the assets for a substantial period have earned less. Under the statutory formulation, this deficit enters into the computations when the assets in the fund fail by accumulation to reach expected levels. Although the purpose of the board in recomputing the pension liability seems designed to prevent accelerating rates of normal contribution because of the failure of the assets on hand to reach expected levels, the statute does not provide for this approach. All valuations must be made using regular interest assumptions, and, if the result is a stepladder effect, the cure is in legislation rather than unauthorized board action. Nowhere in the statute is there language suggesting a power to make discretionary adjustments in the stated factors; rather the modes of computation are rigorously specified.
The nub of the issue, of course, with respect to the mandate to compute reserves on an assumed 4% interest rate, is that the rate is used to determine the rate of accumulation of vast funds. Certainly, the goal of accumulation of funds in any actuarial scheme is satisfaction of the total of anticipated liabilities. These are the factors in any actuarial computation, and the principles involved are most elementary. It is, of course, impossible to obtain a level rate or an advance rate based on actual earnings because none knows the future. In the insurance and annuity business earning rates are assumed. Such assumed rates will never be identical with any current earning rate. They will be either higher or lower. The initial assumed rate is vital to the computation, however, and is based not on short-term but long-term experience. In the private life insurance and annuity business the assumed rate of interest for computing reserves never changes once fixed in the contract or policy. Industry-wide changes have been made only after the passage of many years, sometimes decades. But the interesting and highly *241 relevant factor is that changes in the assumed interest rate in the computation of reserves in the insurance-annuity industry is closely controlled by statutes and the regulating State departments. No discretion as that claimed here is lodged in the accumulators of the vast funds involved. In this case, the board claims a discretion, limited only by unreasonableness, to adjust assumed interest rates, and does so in the face of the statutory language that regular interest, defined as 4%, shall be the rate at which reserves are to be computed. Indeed, the statutory direction becomes wholly insignificant if the board is free to change the rate, either by direct alteration or by the two-step adjustment to the same end. The irony is that after the board claimed to do this, later financial developments, persisting now for some years, prove that the 4% rate is not so unrealistic over the long-term, as the shorter term experience seemed to prove.
The board's second purpose, the attempt to use the deficiency contribution to fund the Birnbaum liabilities, was also improper, since funding for these liabilities was specially provided by the Legislature through the special deficiency contribution. Indeed, it is difficult to understand why the board thought it proper to introduce the Birnbaum liabilities in justifying the continued deficiency rate. The majority opinion ignores the salient fact that the Legislature made provision for funding the Birnbaum case liabilities, and did so, not by assessments through the deficiency contribution, but, and this is extremely important, through the special deficiency contribution. This is a cogent indication that neither the pre-existing legislation nor the deficiency contribution was available for that purpose.
The third purpose, the provision made by the board for death-gamble benefits not yet legislatively enacted, was also improper since it assumed the repeated extension of the temporary statute and thus the existence of liabilities which had not actuarially or legally arisen. In effect, the board has attempted to provide funding for death-gamble benefits on a long-term accrued basis, whereas the "death-gamble" statute provides only for a year-to-year pension liability. While it is undoubtedly true that the benefits are likely to be continued, the statute does not authorize the estimate of liabilities on conjectures, however strong, but only on the basis of actuarial experience and liabilities legally fixed.
*242 The board justifies its use of the deficiency contribution for the above three purposes by the language of section 517 (subd. 2, par. e), which provides that the deficiency contribution shall be discontinued as soon as the accumulated reserves plus the present value of future contributions equal the present value of total liability "as actuarially computed and approved" by the board. Whatever the meaning of the quoted language, it cannot mean that the board is free to ignore specific directives in other sections concerning methods of valuation and funding.
Thus, the second cause of action which requests a refund of the deficiency contribution assessed in 1963-1964, after the historical deficiency had been fully liquidated, should be sustained.
However, the first cause of action, which seeks recovery of a portion of the deficiency contribution assessed during 1962-1963, has no merit. The school districts base their claim on the fact that the contribution for that year was more than sufficient to liquidate the deficiency. But, the statute does not prevent collection of a deficiency contribution during the year of liquidation in excess of that required to liquidate the deficiency. First, obviously it would be impossible to determine a deficiency contribution rate which would result in liquidation to the exact penny. Second, the statute specifically requires that "the amount of each annual deficiency contribution shall be at least three per centum greater than the preceding annual payment" (§ 517, subd. 2, par. d). Where, as here, the total deficiency to be liquidated is less than the amount of deficiency contribution of the year before, the contribution collected during the year of liquidation must inevitably result in over-collection. In setting a deficiency contribution rate which would result in over-collection, the board acted in accordance with the statutory mandates. Thus, there is no basis for a refund of any part of the deficiency contribution assessed for the fiscal year 1962-1963. Hence, the first cause of action should have been dismissed, as it was.
Turning to the third and fourth causes of action, the school districts assert that, because the board established, pursuant to the statute, a special deficiency contribution rate in 1958-1959 which has since been constantly applied, the special deficiency will be liquidated over a 17-year period. This results, as a matter of experience, from the increased teacher payrolls to which the rate is applied. Under their interpretation of the *243 statute, the special deficiency must be liquidated over a 30-year period through a uniform assessment each year. The board interprets the statute as requiring that an initial assessment rate be computed in the year of computation on the basis of liquidation in 30 years, but that that rate must then be applied uniformly in subsequent years until the special deficiency has been liquidated, regardless of how subsequent experience might accelerate (or decelerate) the intended ultimate accumulation of reserves.
The interpretation of the statute by the school districts is not supported by the language. The provisions governing the special deficiency contribution require that the actuarial valuation of pension liability not dischargeable by the funds in hand and the normal and deficiency contributions ("special deficiency") be made as of June 30, 1957. The actuary must at that time determine that annual payment which, if made uniformly from July 1, 1958 for a period of 30 years, would provide for the special deficiency already determined. The special deficiency contribution rate is then fixed at "the per centum of the total compensation of all contributors during the preceding school year [i.e., 1957-1958] which is equivalent to such annual payment" (§ 517, subd. 2, par. c).
The 30-year figure is thus used only as a factor for computing a uniform rate to be applied each year.[6] Thirty years is not the period of time over which the special deficiency must be liquidated, but only an initial assumption, legislatively directed to alleviate the burden on the school districts as it would be at the time of computation.
Thus the adoption by the board of a special deficiency contribution rate, to be applied uniformly for as many years as necessary to liquidate the special deficiency, was in accord with the statutory mandates, and the third and fourth causes of action should have been dismissed, as they were.
The fifth and final cause of action challenges the method by which the normal contribution rate was fixed for the school year *244 1964-1965. The school districts maintain that the allowance for "possible change in the mortality tables" was illegal since the statute requires that mortality tables "adopted" by the board be used; that the allowance for "possible use of a 3½ percent interest rate" was illegal since the statute requires that computations be based upon "regular interest"; and that the allowance for the payment of anticipated future "death-gamble benefits" was illegal, since these benefits had been granted only to those member teachers who died before July 1, 1965, and had not yet been extended by the Legislature. The board replies that it is actuarially sound to allow for mortality table changes, and again points to the fact that the fund had not been earning expected interest. It also points out that death-gamble benefits had been extended each year for an additional one-year period, and there was every reason to believe that the Legislature would continue to do so. Since these benefits would almost certainly become a future pension liability, it was necessary to allow for them. The board maintains, therefore, that the consideration of all these factors was a proper exercise of discretion in accord with its responsibility for maintaining a fiscally sound pension system.
The inclusion by the board of each of these factors was in contradiction, however, of the statutory mandates.
The statute provides, as to mortality tables, that valuations for purposes of setting the normal contribution rate be based on mortality tables "adopted" by the board. What the board did, however, was to adopt mortality tables based on proper actuarial experience and then to make gross mechanical adjustments based on conjecture as to the length of time in which such tables would become obsolete. If the adjustment for the "one-year setback" was intended to express an actuarial experience as to the "mortality" of the mortality tables, based on proper data, it might have been reasonable. In that case, however, such an actuarial experience should have been reflected by the adoption of new mortality tables. Moreover, it has not been shown that the one-year setback is any more valid than a two-year or ten-year setback or, for that matter, a one-year advance, or that the obsolescence of a mortality table works evenly over the whole age scale of the table. Indeed, the board *245 concedes that this adjustment was a gross "across-the-board assumption."
In addition, the board admits that the one-year setback was not based solely on any actuarial experience or even assumption concerning the rate of obsolescence of mortality tables, but was also designed to compensate for interest deficit and any other losses or deficits that might arise. Thus, what is involved here is not simply a procedural defect which could be remedied by formal adoption of a new mortality table. What the board has actually done is to approve an actuarially sound mortality table and then use it as a starting point for conjecture. This sort of speculative computation is not permitted by the statute, is indeed forbidden, and, if allowed, would permit rather uncontrolled manipulation of the funds, arbitrary interference with the tax impact on districts, and the improper over-accumulation of funds in the control of the board.
The allowance for "possible use of a 3½ percent interest rate" is also invalid. The statute explicitly requires that valuations used for determining the normal contribution rate must be based on "regular interest". The use of any other interest figure is, therefore, not authorized.
Finally, the board's consideration of possible pension liabilities based on death-gamble benefits not yet created was improper. Again the statute's mandate is clear. The normal contribution rate for 1964-1965 was designed to provide funds sufficient to cover a reserve for the current pension liability, which, as to teachers who did not die prior to July 1, 1965, did not include a death-gamble benefit. The legislative scheme is a plan for funding future liabilities based on actuarial computations, that is, experience and legally fixed liabilities, and not on conjecture, however reasonable, as to future legislative action. If the legislative intention is that death-gamble benefits will be extended each year, or that the liability should be funded on that tentative assumption, then it is up to the Legislature, rather than the board, to establish provision for such funding, as was done with increased pension benefits in 1956 and the Birnbaum case liabilities.
Thus the method by which the board computed the normal contribution rate for 1964-1965 was invalid, and petitioners' fifth cause of action should be sustained.
*246 The analysis thus far demonstrates that the statutory scheme binds the board by specific and explicit rules governing the actuarial administration of the retirement system. More extended consideration confirms this view of the statutory language by establishing the legislative purpose. The reason for the Legislature's concern should be apparent.
If the board were to possess the discretion claimed for it, the factors so precisely fixed by the Legislature would become meaningless. An adjustment in any one of the factors (such as a 3½% interest rate rather than 4%), superficially involving small numbers, may have considerable financial impact on school districts by reason of the huge sums to which the factor is applied.
The financial implications of the exercise of such discretionary powers are evident from the sums involved in each cause of action in this case. The deficiency balance carried on the books during 1962-1963 was $20,443,787. The deficiency contribution rate of 4.29%, assessed against a total payroll during that year of approximately $778,000,000, resulted in the collection of approximately $32,000,000. The result was an overcollection of some $12,000,000, which the school districts seek to recover in the first cause of action. No deficiency was shown on the balance sheet as of June 30, 1963, the previous balance having been completely liquidated by that year's collections. The deficiency contribution rate of 4.29% applied to the 1963-1964 payroll of approximately $817,000,000 resulted in the collection of some $35,100,000, which total sum is the subject of the second cause of action. The special deficiency contribution rate was set at 1.35%, designed to fund a special deficiency of approximately $106,366,000 as actuarially computed on June 30, 1959. Although the record reveals no figures showing the actual amounts of overpayment which the school districts contend they have made pursuant to the erroneously fixed special deficiency contribution, they estimate the refund necessary as approximately $30,000,000. The normal contribution rate recommended by the actuary for 1964-1965 was 11.43%, and included a 1.5% component for the factors improperly considered. The actual rate adopted was 10.72%, which might or might not have included the full 1.5% for the illegal factors. Although the total payroll for 1964-1965 does not appear in the record, the *247 school districts estimate that the refund to which they would be entitled is in excess of $12,000,000.
Moreover, the control of such huge funds by the board has significant economic and social consequences. It would be rash to leave the board with power to manipulate the size of such funds by discretionary adjustments of factors with such tremendous leverage. Illustrative of the great sums involved is the increase in funds controlled by the board. From June 30, 1960 to June 30, 1964, the increase was from $704,169,121.08 to $1,292,822,969.37. Annual contributions collected from school districts in the same period increased in similar proportion from $70,887,975.79 to $124,231,656.80. According to the board, the present value of the system's liabilities when this proceeding was brought was $2,707,225,067, and as of June 30, 1967 was $5,033,710,811.
The board justifies its view that the statute impliedly allows for the exercise of discretion, although there is no express language to that effect, on the ground that there is a need to make certain adjustments in order to maintain a fiscally sound system. However that may be, when serious problems of adequate funding have arisen, special legislation, rather than board discretion, has been the Legislature's solution, as with the 1956 increased benefits and the Birnbaum case liabilities, previously noted.
Because of the serious consequences that assessment rates have upon the burden of local school districts, to permit these rates to be freely varied through the interposition of "discretionary" glosses on the explicitly defined factors would be to place an unwarranted power over the school districts in the hands of the board. On the other side, the too easy accumulation of unnecessarily huge funds, with concomitant opportunities for investment, control, and influence, represent dangers which for over half a century have produced rigorous supervision and controls in the fields of insurance, annuity, and investment funds (cf. A Special Report to Governor Nelson A. Rockefeller on the New York State Teachers Retirement System, New York Insurance Department, Dec. 20, 1965, pp. 11-12, iii). In short, a pragmatic view of the statutory scheme forbids the conclusion, based only on implication, that the board has the type of discretion in fixing contribution rates which it sought to exercise.
*248 Eliminating the disputed discretionary power, the standards for applying limitation periods arise rather simply. Since the manner in which the board may fix proper contribution rates was mandated, the four-month Statute of Limitations runs from the time of the refusal of the board, upon demand, to perform its duty (CPLR 217; see Austin v. Board of Higher Educ., 5 N Y 2d 430, 442; Matter of Cash v. Bates, 301 N.Y. 258, 261; Matter of Williams v. Morton, 297 N.Y. 328, 334). In the case of the first two causes of action, those relating to the assessment of the deficiency contribution, demand was made by petitioners at a meeting of the board on April 24, 1964. Thus the petition, served July 20, 1964, was served within the four-month statutory period. As to the third and fourth causes of action, seeking recomputation of the special deficiency contribution, the article 78 petition itself was the demand, and the four-month statutory limitation would be no bar. The demand for proper assessment of the normal contribution rate was made when an amendment to the original petition, adding the fifth cause of action, was served by stipulation on January 29, 1965. Here, too, since the demand was made concurrently with the institution of the cause of action, the four-month statutory limitation is not a bar.
The only remaining question, then, is whether there was an unreasonable delay in making the demands, or any of them, thus invoking the doctrine of laches. The intention of CPLR 217 to impose a short Statute of Limitations for the review of administrative determinations cannot be frustrated by the simple device of delaying the making of the demand so as to toll the statute (Austin v. Board of Higher Educ., 5 N Y 2d 430, 442, supra). Thus, under case law, it was necessary that the demand be made within a reasonable period of time after actual or constructive knowledge by the school districts that illegal rates of contributions would be assessed (Matter of Amsterdam City Hosp. v. Hoffman, 278 App. Div. 292, 297).
The courts below acted on the assumption that the delay should be measured from the date the board's determination fixing the assessment rates was made. However, delay in making the demand should be measured from the date that the fixing of improper contribution rates was or should have been discovered (Matter of Amsterdam City Hosp. v. Hoffman, supra; Matter of McDonald, 34 App. Div. 512; see, also, Matter of Kleinman, 20 A D 2d 594; *249 Matter of Devens v. Gokey, 12 A D 2d 135, 137, affd. 10 N Y 2d 898). To require that the demand be made before the school districts were or could have been aware that the board had acted illegally would be unreasonable.
Since the rulings of the courts below concerning laches were based on erroneous standards, they are not conclusive. In any event, a review of the record established that, as a matter of law, laches does not bar the first, second and fifth causes of action. As to the third and fourth causes of action, laches could well be found, but this issue need not be resolved in view of the determination that these causes of action should fail on the merits.
The school districts did not acquire knowledge that the board had assessed deficiency contribution rates, which resulted in collection in excess of the deficiency balance in 1962-1963 and thus improper collection of any deficiency contribution for 1963-1964 (first two causes of action), until a meeting of the board held March 19, 1964. In support of their position that the school districts should have known earlier of the alleged impropriety of the rates as assessed, the board has pointed to the ability of the school districts to make the simple arithmetical computation which would have revealed the impending liquidation of the deficiency. However, there is no indication that the valuations, that is, the data or massive figures upon which the rates were to be computed and applied, were known to the school districts before the March 19, 1964 meeting. In fact, the official valuations of the system for 1962-1963 by the actuary, revealing the relevant figures, were not approved by the board until April, 1964. Thus the demand, made one month after the school districts could possibly be aware of the illegality of the challenged assessments, was certainly not unreasonably delayed.
However, the third cause of action might well be barred by laches, if it indeed had merit. It seeks a refund of the special deficiency contributions actually collected since 1958-1959, on the ground that the rate improperly provided for liquidation of the special deficiency balance over a 17-year rather than a 30-year period. The challenged special deficiency rate was fixed on April 27, 1958, and was constantly applied in each successive year, a fact of which the school districts must have been aware. Since the gravamen of the third cause of action was the assessment *250 in the past at a constant rate (rather than an annual contribution of a constant amount), this cause of action would seem to be barred by laches.
The same analysis, however, does not bar the fourth cause of action, which seeks recomputation of the special deficiency contribution rate for future years. This cause of action demands that the board determine the special deficiency contribution properly in the future; hence, it challenges determinations which have not yet been made. Like the third cause of action, however, this cause of action does not survive on the merits.
Determination of the timeliness of the demand contained in the fifth cause of action (for recomputation of the normal contribution rate for the 1964-1965 year) is complicated by the difficulty in fixing a precise time for the board's failure to perform its duty. In the earlier laches discussion, it was assumed that the relevant time was when the school districts learned of the board resolutions fixing the rates of assessment (March 19, 1964). However, the passing of the resolutions alone would not constitute a breach of a duty until the contribution was actually assessed according to this improper rate. Under the statute, the process of actual collection of employer contributions does not begin until the board "certif[ies] to the commissioner of education a statement of the total amount necessary to be paid by all employers for the ensuing fiscal year * * * as provided under [§ 517, subd. 2]" (§ 521, subd. 2, par. a). The ultimate duty which the board must perform, then, is to certify the contributions required, applying a legal rate of assessment to the total compensation of member teachers. Such certification, however, could not be made until the total compensation had been established, which would only be after the close of the relevant school year. Thus, as to 1964-1965, this certification could be made, at the earliest, on June 30, 1965.
It would thus appear that for a considerable period of time following the board resolution of March, 1964, the normal contribution rate would not become effective. The amendment to the petition, setting forth the fifth cause of action, was served on January 29, 1965, at least five months before the board would be in a position to certify the contributions to be collected. Thus at the time the amendment was served, the board's resolution *251 had not yet become a final decision improperly assessing the 1964-1965 normal contribution.
Because the record does not make clear when the board took the final action which would constitute a failure to perform its duty, the doctrine of laches cannot be applied. Hence, as a matter of law, there was no unreasonable delay shown in making the demand.
But, even endeavoring to apply the doctrine, the delay was, at most, 10 months, assuming the measurement should commence from the board meeting of March, 1964 at which the school districts presumably obtained knowledge of the resolution. In view of the complexity of the issues involved, this period of time was not unreasonable.
Moreover, the board was always aware of the dissident contentions. Six months before service of the amended petition, that is, in July, 1964, the board was aware that the school districts contended that the consideration of an interest rate other than regular interest, and the consideration of death-gamble benefits not yet legislatively enacted, were in excess of its statutory authority. Although these contentions, as asserted in the first and second causes of action, involved the deficiency contribution rate, their application to the normal contribution rate is obvious. Thus, the board should have been aware of the demand to be formally made several months later concerning the normal contribution rate.[7]
Finally, as indicated above, at the time the amendment to the petition was served the board was still in a position to recompute the normal contribution rate. The certification of the contribution to be collected based on the contribution rate would not be made for five months. The collection itself would not take place until January and March of 1966. It seems, therefore, that the board could have complied with the demand with relative ease.
Because of all the above factors, the school districts did not unreasonably delay, as a matter of law, the making of the demand.
The determination of the courts below that the demand contained *252 in the fifth cause of action was made unreasonably late is defective for another, independent, reason. Both courts assumed that the fifth cause of action should be treated, for laches purposes, as though it were first asserted at the time of the amendment, January 29, 1965. Under the provisions of CPLR 203 (subd. [e]), however, the courts were required to treat the fifth cause of action as though it had been asserted at the time of the filing of the original petition, July 20, 1964.
The board had notice of the contentions later forthcoming in the amended petition when the original petition was served. Affidavits submitted in support of the original petition challenged the board's departure from the regular interest assumption and reference to death-gamble liabilities in the calculation of the deficiency rate. And the petition itself asked that the "Board be directed to * * * amend or modify any other [apart from the deficiency and special deficiency] rates of contribution which the Court feels may be just and proper." These allegations were sufficient to put respondents on notice that the propriety of departing from regular interest assumptions and using prospective death-gamble liabilities would be challenged as to any computation which the board might make. These contentions form the gravamen of the fifth cause of action, which attacked the normal contribution rate for 1964-1965.
Thus regarded, the demand was made little more than four months after the normal contribution rate was disclosed (March 19, 1964). In light of the complexity of the questions involved and the nonfinal nature of the March 19, 1964 action, this delay could not be regarded as unreasonable. Consequently, the fifth cause of action is not barred by laches.
In sum: the first cause of action, seeking a refund of over-collection of the deficiency contribution in 1962-1963, in which year the not yet liquidated deficiency would be liquidated, was properly dismissed on the merits; the second cause of action, seeking a refund for the deficiency contribution in the ensuing year should be sustained on the merits and is not barred by the statutory limitation or laches; the third and fourth causes of action, relating to the liquidation period (17 and 30 years) of the special deficiency contribution, were properly dismissed on the merits; and the fifth cause of action, covering the improper factors introduced into the rate of normal contribution (interest *253 deficit, mortality table setback, and assumed extension of the death-gamble benefits) should be sustained on the merits, and is not barred by the statutory limitations or laches.
Accordingly, the order of the Appellate Division should be modified to the extent of reinstating the second and fifth causes of action and the matter remitted to Special Term for further proceedings, and the order should be otherwise affirmed.
Order affirmed.
NOTES
[1] The system operates on a fiscal year beginning July 1 and ending June 30. Thus, for example, the fiscal year 1965 began on July 1, 1964.
[2] We would simply observe at this point that the greatest danger in a system such as this is the underestimation of those liabilities. If they are fixed at an unrealistically low level, then, the system, unable to build up sufficient reserves over the years, will have to assess its contributors directly in the years when its unanticipated and unaccounted for liabilities become due. In the context of the present case, such emergency assessments would have to come out of the operating expenses of the school districts, resulting in hardship not only to the petitioners but to the children whom they serve since, obviously, less money will be available for other purposes.
[3] The other funds which make up the system include an "Annuity Reserve Fund" (§ 517, subd. 1) and a "Pension Reserve Fund" (§ 518). When a teacher retires, his accounts in the Annuity Savings and Pension Accumulation Funds are transferred to the Reserve Funds. There is also an "Expense Funds," financed entirely by assessments of the employers (§ 519).
[4] This is done by computing the present value of the liabilities which are to be financed by the normal contribution and, after deducting the fund's present assets, dividing such figure by the present value of the teachers' future salaries.

It is to be noted that, in applying this formula, the liabilities and the future salaries of teachers must be reduced to their "present values," that is, the amounts which, if paid today, would be sufficient to pay those items when they become due. In arriving at those present values, the system's actuary is required to use an earnings assumption computed "on the basis of regular interest" (§ 517, subd. 2, par. b)  a fixed statutory interest rate (§ 501, subd. 9; see, infra, p. 226). Thus, in order to fix the present value of a liability, the actuary first estimates its annual cost and then finds the amount which, if deposited today in an account earning regular interest, would yield the required amounts in the years in which they are to be paid.
[5] Section 517 (subd. 2, par. b) describes the first method as follows:

"On the basis of regular interest and of such mortality and other tables as shall be adopted by the retirement board, the actuary * * * shall determine the uniform and constant percentage of the earnable compensation of the average new entrant, who is a contributor, which if contributed * * * throughout his entire period of active service, would be sufficient to provide for the payment of a death benefit payable on his account and to provide at the time of his retirement the total amount of his pension reserve. The rate per centum so obtained shall be known as the `normal contribution' rate." (Emphasis supplied.) The statute then proceeds to outline the "second method": "After the deficiency contribution has ceased to be payable, the normal contribution shall be the rate per centum of the earnable salary of all contributors obtained by deducting from the total liabilities of the pension fund the amount of the funds in hand to the credit of that fund and dividing the remainder by one per centum of the present value of the prospective future salaries of all contributors as computed on the basis of the mortality and service tables adopted by the retirement board and on the basis of regular interest." (Emphasis supplied.)
[6] This dollar amount was originally set at 4% of the deficiency balance (§ 517, subd. 2, par. c) but each succeeding annual payment was required to be 3% greater than the preceding one (§ 517, subd. 2, par. d). As a result, in later years, there was no direct relationship between the amount of the deficiency balance and the deficiency contribution rate, and changes in the former would not affect the annual amount which the board was required to assess.
[7] Unlike the pension benefits, the amount a teacher would receive as an annuity was not fixed by statute but was to be determined actuarially on the basis of the amount of his contributions. (Education Law, § 510, subd. 2; see Birnbaum v. New York State Teachers Retirement System, 5 N Y 2d 1, 7, supra.)
[8] We simply note that the minority herein agrees that three of the counts  the first, third and fourth  fail to state a cause of action and were properly dismissed below.
[9] Thus, in so many words, section 508 (subd. 2) declared that "Any deficiency in the amount required to cover the interest requirements of the funds * * * shall be paid from the pension accumulation fund."
[10] By 1965, the deficiency contribution rate had grown to 4.29% of the annual payroll of the school districts. In sharp contrast, the cost of financing the interest deficit liability through the normal contribution was less than 1.5%. Consequently, the board's determination to increase the normal contribution rate for 1965 rather than to continue the deficiency contribution can hardly be said to have adversely affected the school districts.
[11] The amount of this reserve was estimated by determining the increase in the value of total liabilities which would result from an additional life span of one year for all teachers.
[1] "the uniform and constant percentage of the earnable compensation of the average new entrant, who is a contributor, which if contributed on the basis of the compensation of such contributor throughout his entire period of active service, would be sufficient to provide for the payment of a death benefit payable on his account and to provide at the time of his retirement the total amount of his pension reserve."
[2] "the rate per centum of the total compensation of all contributors during the preceding school year which is equivalent to four per centum of the amount of the total pension liability on account of all contributors and beneficiaries not dischargeable by the aforesaid normal contribution made on account of such contributors during the remainder of their active service."
[3] "the rate per centum of the earnable salary of all contributors obtained by deducting from the total liabilities of the pension fund the amount of the funds in hand to the credit of that fund and dividing the remainder by one per centum of the present value of the prospective future salaries of all contributors".
[4] "the special deficiency contribution rate for use in determining the annual payments to be made in each fiscal year commencing with the year beginning with the first day of July, nineteen hundred sixty, shall be increased to liquidate the total unfunded special deficiency adjusted to include the prospective deficit in the annuity reserve fund".

These additional liabilities could of course have been funded through the normal or deficiency contributions, but such funding would have been more burdensome and thus the Legislature provided for the funding on a more deferred basis.
[5] After the 1963-1964 fiscal year, the board no longer attempted to fund these deficiencies out of the historic deficiency contribution, but from the normal contribution, which gives rise to some of the claims in the fifth cause of action in this proceeding.
[6] This method of computation is in sharp contrast to the provisions governing the normal and deficiency contribution rates. There is no specific time base set for the computation of the normal and deficiency contribution rates and, in fact, the statute clearly intends that the valuations, and, therefore, the rates based on these valuations, change (§ 508, subd. 5).
[7] In fact, in their original petition, the school districts sought the recomputation of "any other rates of contribution which the Court feels may be just and proper."